BROWN & JOHNSTON *v.* JOHN BACON et al.

W. and F. recovered a judgment in the United States Circuit Court, against
T. R., in November, 1839, for the sum of $6,529.49, and an execution was
issued upon this judgment, which was never enrolled according to the act of
1844, and which was in February, 1851, levied on the property of said T. R.
by the marshal, when B. & J., the appellants, became the purchasers; but on
the 7th day of March, 1850, B., S. & R. also recovered a money decree in
the superior court of chancery against the said T. R., which decree was duly
enrolled in the proper county before the levy and sale by the marshal; and
after the purchase of the property by said B. & J., an execution was issued on
the decree rendered in the superior court of chancery, and levied by the sheriff
on the same property purchased by B. & J., who sued out an injunction to stop
the threatened sale:— *Held,* that the lien law under which B., S. & R. claim
to have the property sold again to satisfy their decree, declares that the lien
shall have no existence whatever as to property, which has been once sold
under an execution against a common debtor, and a perpetual injunction
ought to have been granted against the levy and sale of the property by vir-
tue of the execution in favor of B., S. & R.; this proceeding falling within
the general rule of a bill of interpleader, it should be so regarded.

The enrolment act (Hutch. Co. 891, § 1) applies as well to judgments or de-
crees previously rendered in the federal courts as to those rendered in the
State courts.   *Tarpley* v. *Hamer,* 9 S. & M. 312; *Bonaffee* v. *Fisk,* 13 Ib. 682,
cited and confirmed.

The ninth section of the enrolment law declares that after a sale of any prop-
erty by the sheriff or coroner, on execution, before the money is paid over by
him, he shall examine the "judgment roll," and apply the proceeds of such
sale to such elder judgment or decree having a priority of lien, &c., and the
marshal is equally required to do the same.

Where a party has been instrumental in preventing an officer from performing
his duty in the application of money, and has retained the same under his
control, he cannot be heard to object to the performance of the officer's duty
in the application of the money.

A party having a priority of lien under the "judgment roll" law is as much
entitled to money made under an execution issued upon a judgment in favor
of another person as if the sale had been made under his own execution:—
*Held,* that B. & J. are required to pay the amount of the proceeds made
under the execution of W. & F. to B., S. & R., for whose benefit the sale
by operation of law was made.

This case does not come directly within the provisions of the "enrolment law,"
no money having been actually made by the marshal, and the judgment of
the United States court not having been enrolled as was the case in *Bonaffee*

*v. Fisk.* The State court, if the money had been made by virtue of its decree, could not, therefore, have appropriated it to the judgment of the United States court. No question of appropriation under the statute could have arisen in that court; and I do not think we should apply the equity of the statute to a case not coming within its terms. This case would not justify its application, even if admitted as a general rule. — J. HANDY, *dissenting.*

Under the rule as held by the federal court, the judgment of W. & F. in that court being prior in date to the decree of B., S. & R., was the superior lien. If the actual money had been made by the marshal under that judgment, that court could have compelled its payment to the execution issued upon that judgment, and this court could not have interfered with the appropriation. But instead of paying the money, as would have been the case if the execution had taken its regular course, the plaintiffs in the execution agreed to take and did take the notes of B. & J. to themselves as a substitute for it, and thereupon their execution was returned and now stands satisfied. — J. HANDY, *dissenting.*

Though B. & J. supposed they were obtaining a good title to the property under the oldest judgment lien, and were mistaken, yet it was merely a mistake of law against which they can claim no relief. — J. HANDY, *dissenting.*

The notes executed by B. & J. must be considered as made in reference to the law as held by the tribunal to satisfy whose judgment they were executed, and upon a consideration valid and legal according to that law; and the party who has deprived the plaintiffs in the execution of the benefit of their judgment by giving his notes for the money due upon it, cannot be discharged from his obligation because he is mistaken in what he acquired, there being no fraud in the transaction. — J. HANDY, *dissenting.*

This should not be entertained as a bill of interpleader. — J. HANDY, *dissenting.*

If the position contended for be correct, that the "enrolment act" of 1844, (Hutch. Co. 802, § 7,) applied to the federal court, B. & J. got a good title against all other liens, and therefore cannot complain that they may be deprived of the property by the lien of B., S. & R., and come into equity to have the legal title settled which they obtained by their purchase. — J. HANDY, *dissenting.*

ON appeal from the superior court of chancery; Hon. Charles Scott, chancellor.

This was a bill of complaint filed on the 18th of February, 1852, by J. H. Johnston & Shepherd Brown against Bacon, Symington & Robins, and James Woods & William Fitzpatrick, and John L. Harris.

It states that Woods & Fitzpatrick, on the 21st of November, 1839, obtained a judgment in the United States circuit

court at Jackson against Brown, Redwood, and Lane, for $6,529.49; that by virtue of an execution issued on this judgment, the marshal, on the 3d day of March, 1851, sold at public auction at the court house for the county of Warren certain land and slaves previously levied on as the property of defendant Redwood; that Johnston bought the land, and Harris, as the agent of Woods & Fitzpatrick, bought the slaves; that by previous arrangement with said Harris as agent, Johnston was to have the benefit of both purchases, and was to give the notes of the firm of Brown & Johnston, the appellants, for the sum bid, payable in two equal instalments, due respectively at one and two years; all of which was done, and Johnston took possession of the property, which he now holds and claims as his own.

That Bacon, Symington & Robins, on the 7th day of March, 1850, obtained a decree in the superior court of chancery against said Redwood for $2,929.40, upon which decree, on the 1st day of March, 1851, an execution issued and was levied upon part of the land sold to Johnston and all of said slaves, and that they threatened to sell the same, notwithstanding his purchase under the marshal's sale before mentioned; that the said two notes remain unpaid, and they have been duly notified by Bacon, Symington & Robins not to pay the same, as they claim a prior lien on said land and slaves, and the right to subject them to their claim, or to have the proceeds of said sale by the marshal. It charges, that if Bacon, Symington & Robins have any just claim at all, it must be to the proceeds of the property under the marshal's sale aforesaid; that the title thereunder is perfect, but as there is an adverse claim thereto by said Bacon, Symington & Robins on one side, and Woods & Fitzpatrick on the other, they cannot safely pay said notes to either without the decree of this court, and pray an injunction against all the defendants until a decree of interpleader settling the dispute, &c.

The answer of Bacon & Robins, surviving trustees of the Bank of the United States, &c., admit it to be true that Woods & Fitzpatrick obtained a judgment against Redwood and others in the circuit court of the United States for the amount

stated, and at the time mentioned in the bill of complainants. They further admit that the sale took place of the land and slaves, as mentioned in the bill, as the property of said Redwood, and that they were purchased by Brown & Johnston in manner as stated. Defendants further answer, that on the 20th day of March, 1850, the defendants Bacon & Robins, together with Alexander Symington, who is since deceased, recovered a decree in the superior court of chancery against said Redwood for $2,929.40, at eight per cent. interest thereon from said 7th of March, 1850, until paid, which decree was duly recorded in the office of the clerk of the circuit court of Warren county, and a certified copy is herewith filed; and that said Redwood, before and at the time of rendering said decree was, and still is, a citizen of Warren county; said land and slaves are and always have been in said county of Warren, before the rendition of said decree, in the possession of said Redwood.

They further admit an execution issued on said decree, and was levied on said land and slaves purchased by said Brown & Johnston. But respondents charge, that by virtue of the provisions of the act of 1844, the lien of the judgment of said Woods & Fitzpatrick was barred by the two years' limitation of that act; that said judgment being barred, the only lien acquired by said execution levied under said judgment, was the time of its delivery, or the time of the levy at the time of its issuance, all of which were long after the rendition of respondents' decree; and their decree was a lien from its rendition, and was a prior lien to that of complainants' execution. Respondents claim the right to sell said land and negroes to satisfy said decree, or if they were entitled to the proceeds of the sale, as complainants contend, they pray that the same be decreed to them.

The chancellor deemed that the decree of Bacon & Robins had the priority of lien on the property mentioned in the bill over the judgment under which complainants purchased, and that complainants have no right to compel the parties to interplead, and that complainants' bill be dismissed. Brown & Johnston prayed and obtained an appeal to this court.

*T. A. Marshall* for appellants.

I insist that the marshal's sale conveyed an absolute title to Johnston, free from any lien or incumbrance in favor of Bacon & Robins, and he might therefore properly enjoin the sale under their execution, and thus prevent a cloud being thereby thrown over his title. The acts of 1841 and 1844, Hutch. Co. 890, 891, commonly called the "abstract" and "enrolment" laws, do not in terms apply to the federal court, and were not intended to embrace that court. Section 7 of the act of 1844 shows that the legislature had reference to purchasers at execution sale by the sheriff or coroner only; and section 9 of the same act requires the "sheriff or coroner" to examine the judgment roll to ascertain if there be any elder judgment or decree having priority of lien, and to apply the proceeds of the sale to the oldest judgment, &c. Neither of these sections speak of or apparently refer to the marshal in any way. He is not required to examine the judgment roll in any case, nor to apply the proceeds of a sale made by him under execution to any older judgment or decree, whether in the State or federal court. He is a United States officer, and I maintain that neither the legislature nor our State courts have any control over him in the discharge of his official duties. And even if the legislature had therefore in express words embraced the federal court in the above-named acts or either of them, the act would have been void, so far as the judgment of Woods & Fitzpatrick is concerned. That judgment was a lien at the time it was rendered on all the property of the defendants, and the legislature could not deprive them of the benefit of it. The case of *Massingill et al.* v. *Downs*, 7 How. S. C. R. 767, 768, expressly decides this point; and I insist that that decision, involving a constitutional question, is binding on this court. If this view be correct, Johnston purchased the property not only under the elder judgment, but the judgment having the prior lien, and it could not be lawfully sold again under the junior judgment, and the sale under the execution of Bacon & Robins should be perpetually enjoined.

If, however, the act of 1844 shall be held by this court to embrace judgments rendered in the federal court, then it is clear that under the 7th and 9th sections, Johnston acquired a good

title by his purchase, and it became the duty of the marshal to apply the proceeds of the sale to the judgment of Bacon & Robins. It may be said he did not in fact receive the money, and he could not therefore make the application. To that I answer, the money has not yet been paid; and Brown & Johnston, by whom it is due, by their bill of interpleader, are trying to do what the marshal would have been required to do, had the money gone into his hands, that is, pay it to the party entitled to it under the law. Certainly the act of 1844 was intended to protect purchasers at sales under execution from the liability of having the property bought sold again under other and older executions. The fact that notes were paid instead of money, can make no difference in this case. Harris, as the agent of Woods & Fitzpatrick, assented to that arrangement, and Bacon & Robins are willing to abide by it. They are entirely willing to receive the notes as money, and that the sale by the marshal shall be considered as a sale for money. Thus it seems to me that the judgment of Woods & Fitzpatrick was older than the decree of Bacon & Robins, and of prior lien, and after the sale under it, the property was not liable to be sold again under the execution of Bacon & Robins. Or if Bacon & Robins had the paramount lien, they were only entitled to the proceeds of the sale, and not to have the property sold again under their decree.

The whole matter may be summed up thus: The act of 1844 embraces judgments in the federal court, or it does not. If it does not, the judgment of Woods & Fitzpatrick was the elder lien, and the sale under their execution passed a valid title. If it does, the purchaser still acquired a good title, and it becomes merely a question of appropriation of the proceeds between the judgment creditors. *Bonaffee* v. *Fisk*, 13 S. & M. 682.

The act of limitations of 1844, limiting the lien to two years, under the principle settled in *Massingill* v. *Downs*, is as clearly unconstitutional as the registry or enrolment acts. All three acts must be regarded as unconstitutional, because they attempt to take away rights previously vested. Woods & Fitzpatrick had a lien at the time they were passed, and the legislature had no power to deprive them of it. Liens of judgments in the

federal courts are derived from acts of the State legislature, but such acts do not themselves confer liens on the federal court judgments. Some action of congress, or of the federal courts under the power conferred on them by congress, under the process act of 1828, is necessary to give the lien. *Clements* v. *Berry*, 11 How. S. C. R. 412. Settling this point, our act of 1824 giving a lien to all judgments from the date of their rendition, has been expressly adopted by the federal court, and cannot now be repealed or taken away without the consent of congress or of that court, which has never been given, that I am aware of.

*Freeman*, *Adams*, and *Dixon* on the same side.

It is necessary to show that two or more persons claim the same thing in the hands of the complainant, who must have no interest therein, but hold as a stakeholder, or the bill will be dismissed. 2 Story's Eq. 133, § 806, and the cases cited.

It is also necessary that the complainant so make out his case as to negative any interest in himself. The true ground upon which the plaintiff comes into equity is, that, claiming no right in the subject-matter himself, and that he is liable to be vexed with two claims adverse to each other, which upon each he may be held liable; the object is to avoid his being harassed with a multiplicity of suits. 2 Story, Eq. 136, § 887, and cases cited.

Does the complainant occupy that neutral position in the present case? Can it be truly said he has no interest in the land and property which is the only thing in his possession that can be reached by B., S. & R.; for surely it will not be contended that they may have the proceeds of the two notes diverted to their use? Have they not such an interest in the notes as will exclude them from the benefits of an interpleader.

It is not every case of hardship that will justify a court of equity to interfere; the case stated must give the court jurisdiction.

*George S. Yerger* for appellee.

This court has decided that the act of 1844, requiring judg-

ments to be enrolled, applies to the judgments of the federal court. If it adheres to this decision, it would, seem to follow that the various provisions of the act must of necessity apply to the federal court judgment. And in such case the judgment stands precisely on the footing of a judgment in the State court. A sale under such judgment would, by said act of 1844, vest the title in a purchaser under a junior judgment; but the purchase-money, by the terms of the same act, would belong to the elder lien, or enrolled judgment. If the act therefore applies, as this court has decided, I think that Bacon and others are only entitled to the money, and Johnston to the property. But the federal tribunals have decided contrary to the decision of this court, that the enrolment law of 1840 and 1844 does not apply the judgments in the federal court. *Herzer* v. *Fisher,* 13 S. & M. 672; *Massingill* v. *Downs,* 7 How. S. C. U. S. R. 767.

The ground of this decision is, that these recording or enrolment laws, are not laws merely limiting or barring the lien by lapse of time, or in other words an act of limitations barring or limiting the lien, but that it divests the lien and regulates the process of the courts of the United States. If it had been a mere act of limitations barring the lien if not enforced within a particular time, then every decision made by that tribunal would have had the lien of the judgment in the federal court barred. Because it is well settled that a law of limitations is binding on the federal tribunals; whether it limits a cause of action on a judgment or execution in that court, or upon a contract before judgment, as I will presently show.

If this court adheres to its own opinion, then the law applies to federal court judgments, and Bacon and others must take the money and be enjoined from selling.

But if this court follows the opinion of the supreme court of the United States, then the enrolment law of 1844 does not apply to federal court judgments.

The lien of the federal court judgment must, then, be governed by the law, distinct from the enrolment law.

The enrolment law repeals the law of 1824, which gave a a judgment or lien from the time of its rendition. But if it does not apply to federal court judgments, then I admit it does not

repeal the law of 1824 as to federal court judgments, rendered previous to its passage.

From this it will follow, that the lien of the judgment of Harris & Fitzpatrick, under the act of 1824, is good from its rendition, so far as the enrolment law is concerned.

The question is then, Is there any other law barring the lien, which is binding on the federal court judgment? To this I answer, clearly and unquestionably there is.

The act of limitations of 1844, a distinct act from the enrolment law, bars or limits all liens of previous judgments not enforced in two years after the passage of the act. This is wholly a distinct law from the enrolment law. It is strictly a law limiting or barring within two years the liens of judgments.

So far as this court is concerned, it is conclusively settled to be strictly and technically a law limiting a right, or a law of limitations. *Planters Bank* v. *Black*, 11 S. & M. 43; *Emanuel* v. *Jones*, 12 Ib. 473; *Rupert* v. *Darler*, 12 Ib. 697; *Kilpatrick* v. *Byrne*, 3 Mis. R. 571.

This being a mere law of limitations, its construction and effect is conclusive on the federal tribunals. *Grey* v. *Shelby*, 11 Wheat. R.

And a law of limitations whether it relates to a contract, a judgment, or execution, or process, applies equally to judgments and executions on the federal courts, whether named or not. *Ross & King* v. *Duval*, 13 Peters, R. 45.

And expressly so decided by supreme court United States on this very statute limiting proceedings on judgments. *Bank of State of Alabama*, 9 How. R.

It therefore follows, if the enrolment law is applicable to the federal courts, which undeniably I believe it is, then Bacon et al. are entitled to the proceeds of the sale in Johnston's hands. If it does not apply, the act of limitations of 1844 does, and by that the lien of the federal court judgment is barred. And our State decree being enrolled, is a lien by the act of 1844 from its rendition, and we are entitled to sell the property.

Mr. Justice FISHER delivered the opinion of the court.

This is an appeal from a decree of the superior court of chancery, dissolving the injunction and dismissing the bill.

The record presents two questions for consideration:—

1st. Whether the complainants are entitled to a perpetual injunction against the decree of Bacon, Symington, & Robins, so far as an attempt may be made to enforce it against the property named in the bill; and,

2d. Whether the bill can be maintained as a bill of interpleader for the purpose of settling the claim of Woods & Fitzpatrick, and of Bacon & Co., to the money in the hands of the complainants.

The facts as shown by the record relating to each of these questions, will be noticed at the proper time.

The complainants claim title to the property in controversy, by virtue of a purchase made at a marshal's sale in February, 1851, under an execution issued on a judgment in favor of Woods & Fitzpatrick, rendered in the circuit court of the United States at Jackson, in November, 1839, against Thomas Redwood, a citizen of Warren county, in which county the judgment has never been enrolled under the provisions of the act of 1844. On the 7th of March, 1850, Bacon, Symington & Robins recovered a money decree in the superior court of chancery against the said Redwood, which was duly enrolled in the proper office of Warren county before the levy and sale by the marshal, under the execution issued on the judgment of Woods & Fitzpatrick. After the purchase by the complainants at the marshal's sale, an execution was issued on this decree, and was levied by the sheriff of Warren county on the property now in controversy. To perpetually enjoin this threatened sale, is one, and indeed the most important, object sought by the bill.

The only question requiring consideration on this branch of the case is, whether the complainants, by their purchase under the marshal's sale, acquired a title discharged from the lien of the decree of Bacon & Co. This question would seem to be too clear to admit of argument; for taking the position of either party as the correct one, the same result is accomplished. If it be true that the lien of the judgment created by the law at the time the judgment was rendered in 1839, continued up to the

day of the sale by the marshal, regardless of the legislation of 1844, as contained in the enrolment act, and the statute of limitations limiting the liens of judgments theretofore rendered to two years, then of course no question can arise as to the complainants' title to the property. They would be held to have taken it discharged of all intervening judgments against the debtor. If, on the other hand, the position pressed by the counsel of Bacon & Co. be correct, that the lien of the United States court judgment came as fully under the operation of the enrolment law and the statute of limitations, as judgments of the State courts, the result will still be the same, and the purchasers ought to be protected against the decree, the lien of which may, for the purposes of this case, be conceded as superior to that of the judgment of Woods & Fitzpatrick, without in the least endangering the title acquired by the sale under the latter judgment. If the lien be superior, it is only so in the sense of the law which gave it existence, and not to the extent contended for by counsel. It may possibly be superior as to the money arising from the marshal's sale, but the very law which gives to it this superiority declares that it shall have no existence whatever as to property which has once been sold under an execution against the common debtor. The question, then, may be disposed of in few words. Bacon & Co. appeal to the enrolment law for the purpose of showing that the lien of their decree was superior, on the day of the marshal's sale, to the judgment of Woods & Fitzpatrick. The complainants admit it, and show by the seventh section of the same law, that having purchased the property at an execution sale, they took it absolutely and unconditionally discharged of the superior lien. There is, then, no room for debate as to the complainants' title to the property; and no question having been made by Bacon & Co. as to the jurisdiction of the chancery court to grant the relief prayed, the decree dissolving the injunction and dismissing the bill will be reversed.

The remaining question will be now considered, that is, whether this bill can be maintained as a bill of interpleader for the purpose of settling the conflicting claims of Woods &

Fitzpatrick, and of Bacon & Co. to the money in the hands of the complainants, being the avails of the marshal's sale.

It is certain that the complainants have done nothing making them liable to both parties for the same sum of money. Their object is to make, in the first instance, the proper application of the money, and when this shall have been done, to be discharged not only from the notes held by Woods & Fitzpatrick, but also from the threatened claim of Bacon & Co. growing out of their supposed superior lien on the fund. This being the attitude of the case, it appears to fall strictly within the general rule on the subject of interpleaders. Under the facts as presented by the record, this is the end of the controversy; but as both parties desire a decision on the merits, taking the allegations of the bill and the exhibits as true, we will extend our examination for this purpose.

Woods & Fitzpatrick, going back to the origin of their title to the money, insist that as it is the product of a sale under their execution, issued to enforce a judgment of the United States court rendered in 1839, they have the superior title; in addition to which they allege that the notes of the complainants were taken as money, and a corresponding credit therefor entered on their execution.

Bacon & Co., on the contrary, insist that the judgment of the United States court, falling under the operation of the statute of limitations and of the enrolment act of 1844, ceased in 1846 to be a lien on Redwood's property, and that their decree, at the date of the marshal's sale, creating the superior lien, they are entitled to the money.

The facts as shown by the bill are these: Redwood's land was sold under the execution of Woods & Fitzpatrick early in February, 1851, and purchased by Johnston for the benefit of the firm of Brown & Johnston. On the 17th of the same month, Redwood's slaves were sold under the same execution, and were purchased by one Harris, as the agent of Woods & Fitzpatrick; but, as the bill alleges the purchase was virtually made for the complainants, in virtue of a previous arrangement or understanding of the parties, in consummating which, Brown

& Johnston, instead of paying the money to the marshal for the land and slaves purchased, gave their notes, payable in one and two years, to Harris, agent of Woods & Fitzpatrick; and thereupon Harris entered a credit, as above stated, for the amount of the notes on the execution.

The first inquiry is, whether the enrolment act of 1844, Hutch. Co. 891, embraces judgments of the United States court. It provides for the enrolment of the judgments and decrees of any superior, circuit, district, or inferior court of law or equity holden within this State, provided the same be a court of record. Section 1. Its language in this respect is as comprehensive as that of the first section of the abstract law of 1841. In the case of *Tarpley* v. *Hamer et al.*, 9 S. & M. 312, this court, remarking upon the abstract law, as it is commonly called, said "that the case then before them depended upon two questions: first, is the act of the legislature passed on the 6th of February, 1841, entitled an act to regulate the liens of judgments and decrees, a constitutional and valid act as respects prior judgments? and second, if it is so, does it apply to judgments rendered in the federal court? We respond to both of these questions in the affirmative." We quote this decision for the purpose of showing that the law, the enrolment act, applies to judgments previously rendered by the federal courts. In the case of *Bonaffee* v. *Fisk*, 13 S. & M. 682, the court again held that such judgments are clearly embraced by the provisions of the act, and sanctioned the appropriation of money which had been made by the sheriff, under executions from the State courts, to judgments of the United States court, which had been duly enrolled, and which, according to the terms of the 9th section of the act, were entitled to a priority of payment. If these decisions are to be treated as authority, then the question is settled. They must either be followed or overruled. Looking back to the state of things which preceded the passage of the law, we do not feel the least inclined to pursue the latter course. The law was, at the time of its enactment, no less one of necessity, than it is at present one of convenience and sound policy, and as such should be in its true spirit administered.

The rights of both parties must be determined by the 9th sec-

tion of the law, which declares that after a sale of any property by the sheriff or coroner on execution, before the money is paid over by him, he shall examine the "judgment roll" and apply the proceeds of such sale to such elder judgment or decree having a priority of lien, and return such application upon the execution on which such sale shall have been made. What the law requires the sheriff or coroner to do in regard to the application of money arising from a sale under execution, the marshal is equally required to do. Suppose, then, that the judgment of Woods & Fitzpatrick, instead of being a judgment of the United States court, was a judgment of the circuit court of Warren county, and had never been enrolled; and suppose further that the sheriff, instead of the marshal, had made the sale, the sheriff in such case would have been compelled to examine the judgment roll, and apply the money to the decree of Bacon & Co. If this would have been plainly the duty of the sheriff in the case supposed, it was no less the duty of the marshal in the case in which he acted. But it is said that the money was not paid to the marshal, and hence he was not bound to appropriate it. It is true it was not paid to him; but why was it not so paid? There is but one answer which can be given, and that is that the plaintiffs in the execution, through their agent, had otherwise directed. They, then, having been instrumental in preventing a performance of duty on the part of the marshal, and retained the money under their own control, cannot be heard to object to the performance of his duty in its application.

Any other construction of the law would always enable a party, when it was to his advantage, to evade it, and to deprive others of the positive rights which it secures. It is immaterial under whose execution the property of the debtor may be sold, the money, when thus made, must be applied to the judgment or decree, having, in the language of the law, a priority of lien, as evidenced by the judgment roll. The party having such lien, is as much entitled to the money as if the sale had been made under his own execution. The sale destroys the lien as to the property, but it attaches immediately to the money. There are exceptions to this rule, as where the said creditor refuses to give

the indemnity required by the officer, or to do any other act, without which no sale could be made; but, subject to these exceptions, the sale under a junior execution is practically a sale for the benefit of the creditor holding the prior lien. The question, then, is this. Can the complainants legally pay the money, produced by the sale under the execution of Woods & Fitzpatrick, to Bacon & Co., for whose benefit the sale was, by operation of law, made? This question, of course, is answered in the affirmative.

Having disposed of this question, nothing remains but to give directions as to the judgment to be entered.

Decree reversed, injunction made perpetual, the amount of the two notes to be paid to Bacon & Co., and the notes themselves to be cancelled.

SMITH, C. J., concurred.

Mr. Justice HANDY delivered the following dissenting opinion.

Being unable to concur in the opinion of a majority of the court, it becomes my duty to state the reasons of my dissent, which I will do very briefly.

The bill in this case is based upon the provisions of our statute of 1844, in relation to the enrolment of judgments, and the effect of sales made by execution in this State. It is well known that different rules in this court, and in the United States court, prevail in regard to the question whether or not that statute prevails in the federal court; a difference calculated to produce serious difficulty in the legal rights of parties arising under the conflicting rules. In the case of *Tarpley* v. *Hamer*, 9 S. & M., this court held that the law of 1841, requiring abstracts of judgments to be filed in the clerk's office of any county in the State, in order to be a lien upon the defendant's property in that county, was applicable to the United States courts in this State; and in *Bonaffee* v. *Fisk*, 13 S. & M., it was held, that where a judgment of the United States court, and also a judgment of the State court, had been enrolled under the statute of 1844, the court of this State, in which the judgment was rendered, upon motion should apply the proceeds of sale made under an execu-

tion from the State court to the judgment having the senior lien under the act of 1844, and in such case that the act of 1844 applied to the United States court. Believing these decisions to be both correct and the settled law of this court, this court should enforce its view of the act of 1844, as to the appropriation of money, whenever the case presented comes directly under the provisions of that act, or whenever a title derived in the regular course of law, under the provisions of that act, shall be called in question. This is the extent to which this court has gone, and I do not think it would be proper, upon a question of so much delicacy and difficulty as to legal rights, to extend the rule further, and to apply these statutes to cases not coming fully and directly within their provisions.

This case does not come directly within the provisions of the statute, no money having been actually made by the marshal, and the judgment of the United States court not having been enrolled, as was the case in *Bonaffee* v. *Fisk.* The.State court, if the money had been made by virtue of its decree, could not, therefore, have appropriated it to the judgment of the United States court. No question of appropriation under the statute could have arisen in that court. Shall we, then, apply the equity of the statute to a case coming not within its terms? I think such a rule would be unsafe, and that the equity of this case would not justify its application, even if admitted as a general rule.

Under the rule, as held by the federal court, the judgment of Woods & Fitzpatrick in that court, being prior in date to the decree of Bacon and others, was the superior lien. If the actual money had been made by the marshal under that judgment, that court would have compelled its payment to the execution issued upon that judgment, and this court could not have interfered with the appropriation. But instead of paying the money, as would have been the case if the execution had taken its regular course, the plaintiff in the execution agreed to take, and did take the notes of Brown & Johnston to themselves, as a substitute for it, and thereupon their execution was returned, and now stands satisfied.

Though Brown & Johnston supposed they were obtaining

a good title to the property under the oldest judgment lien, and were mistaken in this, yet it was merely a mistake of law against which they can claim no relief. If in a case of doubtful legal right, Brown & Johnston saw proper to take the title to the property under the judgment of Woods & Fitzpatrick, and give their notes instead of paying the money, and in consideration thereof, their execution was entered satisfied, this was a good consideration, and they have a right to the money under the contract, which cannot be disturbed. Certainly it would not be equitable to deprive Woods & Fitzpatrick of their right to the notes without restoring them to the right which they parted with in consideration of the notes, by declaring the return of satisfaction upon their execution as set aside, which this court has no power to do. That right, whether it be in accordance with the rule as held by this court or not, was nevertheless a positive right which could have been enforced under the rule prevailing in the tribunal where it existed, and which was prevented from being enforced by the conduct of the parties now seeking relief against it. The notes must be considered as made in reference to the law as held by that tribunal, and upon a consideration valid and legal according to that law ; and the party who has deprived the plaintiffs in the execution of the benefit of their judgment by giving his note for the money due upon it, cannot be discharged from his obligation because he is mistaken in what he acquired, there being no fraud in the transaction. Under these circumstances, if Woods & Fitzpatrick had sued Brown & Johnston upon the notes, it would have been no defence that under the rules as held by this court, Bacon & Robins had the prior lien upon the property ; much less could they be discharged in a court of equity.

Nor, if the money had been paid on the notes to Woods & Fitzpatrick, could Bacon & Robins recover it from them either at law or in equity, because they have given a good and valid consideration for the notes.

It is not contended that the bill in this case can be maintained as a bill of interpleader proper. But it is attempted to be sustained as a bill in the nature of a bill of interpleader and for

51*

relief against the adverse claims of Woods & Fitzpatrick on the one hand, and Bacon & Robins on the other, to the notes. But Bacon & Robins do not assert any right to the notes, but claim priority of lien upon the property sold. It is, then, in effect, a bill in equity to settle the legal title of Brown & Johnston to the property, calling upon the court to determine whether the notes given to Woods & Fitzpatrick instead of money, for the property purchased under the execution, belong to them, or to Bacon & Robins. Taking the bill in this point of view, I do not think it should be entertained, because, 1st, if the position contended for be correct, that the 7th section of the act of 1844, Hutch. Dig. 892, applied to the federal court, Brown & Johnston got a good title against all other liens, and therefore cannot complain that they may be deprived of the property by the lien of Bacon & Robins, and come into equity to have the legal title settled which they obtained by their purchase; 2d, if that statute did not apply to the federal court, the plaintiffs there were entitled to the avails of the sale under their execution, and it would have been awarded to them by that court. It would not, therefore, be just to deprive them of that which was given in lieu of the money, and to which they became as completely entitled, if the statute do not apply to their execution, as if the money had been actually paid to them.

I am of opinion, therefore, that the bill should be dismissed, and that the rights of the parties, which are purely legal, should be left to the appropriate tribunal at law.